J-S24045-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LUIS ANGEL MARTINEZ | : | |
| | : | |
| Appellant | : | No. 1693 MDA 2022 |

Appeal from the Judgment of Sentence Entered August 18, 2022
In the Court of Common Pleas of Berks County Criminal Division at
No(s): CP-06-CR-0005327-2019

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LUIS ANGEL MARTINEZ | : | |
| | : | |
| Appellant | : | No. 1701 MDA 2022 |

Appeal from the Judgment of Sentence Entered August 18, 2022
In the Court of Common Pleas of Berks County Criminal Division at
No(s): CP-06-CR-0005328-2019

BEFORE:   BENDER, P.J.E., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:        **FILED: SEPTEMBER 8, 2023**

Appellant, Luis Angel Martinez, appeals from the judgment of sentence

entered in the Court of Common Pleas of Berks County after a jury convicted

him of multiple sexual offenses committed against two children.  Sentenced

to mandatory and standard-range guideline sentences, run consecutively,

_____

[*] Former Justice specially assigned to the Superior Court.

Appellant raises challenges to the discretionary aspects of his sentence and to the trial court's order denying his double-jeopardy based motion to bar re-prosecution after a Commonwealth witness's testimony required the trial court to declare a mistrial. We affirm.

We reproduce those portions of the trial court opinion pertinent to the issues Appellant has raised in the present appeal:

> Appellant, Luis Martinez, was charged at docket number CP-06-CR-0005327-2019 ("5327-19") with Corruption of Minors and Indecent Assault, and at docket number CP-06-CR-0005328-2019 ("5328-19") with two counts of Aggravated Indecent Assault of a Child, two counts of Indecent Assault, and Corruption of Minors. The charges stem from incidents of sexual abuse against two minor females over the course of three years. Appellant was represented throughout the pretrial and trial phases by Jacob Gurwitz, Esq. ("Trial Counsel").
>
> The matters first proceeded to trial on July 12, 2021. At that trial, the Commonwealth had presented four witnesses' testimonies, and during cross-examination of the Commonwealth's affiant, there was improper reference made to attempts to interview Appellant. [N.T. Mistrial, at 94].
>
> Trial Counsel requested a sidebar where he presented an oral motion for mistrial, upon which the court declared a mistrial. ***See*** July 12, 2021, Order Granting Def.'s Mot. For Mistrial.
>
> After several requested continuances, [in] which Trial Counsel indicated that Appellant waived his Rule 600 speedy trial rights, the matters proceeded to trial on March 21, 2022.
>
> At trial, the Commonwealth first called [Victim L.R.-R.'s Mother], who was originally from the Dominican Republic, [and she] testified that she has three children, including fourteen-year-old L.R.-R., who was born in 2007. [Trial N.T. 3/21/22 – 3/23/22], at 84-85. After living at several locations in Reading, Mother and her family moved [to a new residence] in Reading. . . . Mother knew Appellant because he lived on the same block . . . .

- 2 -

Appellant lived with his girlfriend . . . and her [children]. N.T. at 89. Mother testified that L.R.-R would go over to Appellant's home, and [Appellant's girlfriend] and her kids would visit [Mother's] home. When Mother began working for the Reading School District, she and her husband would have Appellant and [Appellant's girlfriend] watch her kids, including L.R.-R. N.T. at 91. Mother and her family would go on trips with Appellant and his family and would have them over for holidays. N.T. at 92. Appellant and his girlfriend had keys to Mother's house and were allowed to pick Mother's children up from school. *Id*.

On October 23, 2018, Mother's husband called her at work and told [her] that he found pornography on L.R.-R.'s cell phone, and her husband questioned L.R.-R. about the pornography. N.T. at 94. When Mother finished work at 10:00 p.m., she proceeded home where she and her husband spoke with L.R.-R. N.T. at 94-95. L.R.-R., who was ten years old at the time, told Mother and her husband that Appellant had showed her how to look for pornography, that Appellant had shown L.R.-R. his penis, [and] that Appellant had touched himself and inappropriately touched L.R.-R. N.T. at 96-97. L.R.-R. told Mother that these incidents would occur both at Appellant's home and at Mother's home when Mother was not around. N.T. at 97. Moreover, L.R.-R. told Mother that Appellant had threatened that if she told her family about these incidents Appellant would kill either L.R.-R. or her family. N.T. at 96.

The next morning, Mother did not go to work, but L.R.-R. went to school. N.T. at 97. While at school, L.R.-R. spoke with a neighbor and close friend, [G.R.-F.], who is around the same age as L.R.-R. and who lived next door to Appellant. N.T. at 97-98. L.R.-R. was encouraging G.R.-F. to speak up if Appellant had done anything to her, too. *Id*. Another student overheard the girls conversing and told a school official. N.T. at 98. The school called Mother and she went tin to speak with them and told the school that they were trying to figure out what to do. N.T. at 98. Mother then reached out to G.R.-F. through Facebook and suggested that they go to the police station and make a report, which they then did. N.T. at 99.

After making the report, Mother had to bring L.R.-R in for an interview and then over to the Children's Health Center for a medical examination. N.T. at 102-03. The examination found no injuries requiring treatment. N.T. at 103.

Mother testified that when L.R.-R. was in second grade, she wrote a note in school indicating that she wanted to kill herself and the school notified Mother and gave her the note.  N.T. at 103-04. Likewise, L.R.-R. was not performing well in school.  N.T. at 104. Mother further testified that L.R.-R. had become confused about her sexuality.  *Id*.

At the time that the incidents came to light, [Mother's] property had been paid off.  *Id*.  A few months after she learned of the incidents, Mother testified, . . . her family sold the house and moved away.  N.T. at 104, 108.

. . .

[G.R.-F.'s mother testified] that she came to Reading from Puerto Rico in 2015 along with her partner and three children, including [her daughter, G.R.-F.], who was seven at the time.  N.T. at 137. [After a short while], G.R.-F.'s mother and family moved into a house [they rented from Appellant].  [G.R.-F.'s mother] indicated that her family became close with Appellant's family, who lived in the house next door.  N.T. at 139.

[She recounted that] [o]n October 24, 2019, after [her daughter's] conversation with L.R.-R., [her daughter] spoke to her and told her that Appellant had been touching L.R.-R. inappropriately, and that he had touched [her daughter] too.  N.T. at 141.  [Her daughter] disclosed [to her] that Appellant would kiss [her daughter] on the neck and rub her buttocks.  N.T. at 142.  [G.R.-F.'s mother] did not press [her daughter] for more details at the time because [her daughter] seemed worried and nervous.  *Id*.  When L.R.-R.'s Mother reached out to G.R.-F.'s mother on Facebook, the two women went to the school first and then to file a complaint.  N.T. at 143-44.  G.R.-F.'s mother later took [her daughter] in for an interview.  N.T. at 144.

Prior to learning of the incidents of sexual abuse, G.R.-F.'s mother testified that they had no issues with Appellant as a landlord.  *Id*. After learning of the incidents of sexual abuse, G.R.-F.'s mother and her family moved out of the city.  N.T. at 145.

[Mother's] fiancée, and father to the three children, including L.R.-R., testified that he knew Appellant [for some time before] living on the same block [Appellant].  N.T. at 153-54.  [Mother's fiancé]

was not initially close with Appellant, but they grew closer over time. N.T. at 156. [Mother's fiancé] knew that Appellant owned other properties [on their block] and would help Appellant with those properties from time to time. N.T. at 155. There were times when [Mother's fiancé] would be stuck financially, and he went to Appellant for small loans that were paid back quickly. N.T. at 157.

[Mother's fiancé] stated that he looked at his relationship with Appellant as one of father and son, and that his kids looked at Appellant as a grandfather. *Id*. Appellant would visit the house, and [Mother's fiancé] would visit Appellant's home frequently. *Id*. Because of their work schedules, the children, including L.R.-R. would go over to Appellant's home after school. *Id.* at 158-59.

On October 24, 2019, [Mother's fiancé] got home and found L.R.-R's iPod and went through it and initially did not find anything alarming until he went through her web search history. N.T. at 160-61. In the web search history, [Mother's fiancé] found sexual content, and confronted L.R.-R. about what he had found. N.T. at 161. L.R.-R. initially denied that she had performed the searches, but later reengaged with [Mother's fiancé] and told him that Appellant had been telling her to look for sexual content on the Internet. *Id*. L.R.-R. then told [Mother's fiancé] that once when she was over at Appellant's home, while [Appellant's wife was out smoking a cigarette, Appellant emerged from the bathroom and had exposed his genitals in front of L.R.-R. N.T. at 161 ,169. L.R.-R. noted to [Mother's fiancé] that Appellant would often make comments about L.R.-R. and caress her both at his house and at her house. N.T. at 161-62. L.R.-R. also informed [Mother's fiancé] that while they were all on vacation in Wildwood, Appellant "said some stuff to her." N.T. at 162. L.R.-R. told [Mother's fiancé] that she had not mentioned the incidents before because she was afraid. N.T. at 164. After [Mother] came home that night, she had a conversation with L.R.-R. that [Mother's fiancé] was not involved in. N.T. at 164. The next day, [Mother] took L.R.-R. to City Hall.

. . .

G.R.-F., who was thirteen years old at the time of trial, testified that she knew Appellant as the owner of the house that her family lived in . . ., and that she knew him as El Viejo, which she stated meant "[k]ind of like old man." N.T. at 222. G.R.-F. stated that she would visit Appellant's home, first when [Appellant] lived next

- 5 -

door to her family, and then later when he moved a few houses away. N.T. at 224-26. Along with Appellant, his wife, teenage daughter, and her baby would be there too. N.T. at 226. G.R.-F. indicated eventually that, while she was over at Appellant's home and his wife had left the house, he began to touch her. N.T. at 227-28. Likewise, when Appellant would visit her family's house, and they were in another room, Appellant would touch G.R.-F. in the living room. N.T. at 228. G.R.-F. stated that it would happen every time that she was alone with Appellant and that It began with kissing her neck or Appellant asking her to sit on his lap. *Id*. Appellant would also touch G.R.-F. on her thigh and buttocks over her clothing. N.T. at 229-30. G.R.-F. stated that the touching began when she was seven years old. N.T. at 230.

G.R.-F. explained that she had been talking to L.R.-R. on recess one day at school when L.R.-R. told [her] that [L.R.-R.] did not feel comfortable with Appellant. N.T. at 231. G.R.-F. told L.R.-R. that she also did not feel comfortable with Appellant. N.T. at 231. Another student overheard the two talking and notified teacher. N.T. at 232. The school principal then told the girls to tell their parents about the conversation. N.T. at 232. [G.R.-F. expressed to her mother] that she was scared to tell her because of the close bond that [G.R.-F.'s mother] had with Appellant. N.T. at 233. After telling her mother about Appellant's actions, G.R.-F. related [to the jury] that she attended an interview and that she had participated in counseling to deal with the abuse. N.T. at 234.

On cross-examination, [G.R.-F.] confirmed that the inappropriate touching by Appellant occurred for about three to four years, but that she only notified her parents about the touching after speaking with L.R.-R. and the school principal. N.T. at 243-44. G.R.-F. further acknowledged that she continued to visit Appellant's home after the described inappropriate touching occurred. N.T. at 245-46.

L.R.-R., who was fourteen years old at the time of trial, testified that she first was introduced to Appellant through her father, with whom Appellant was friends. N.T. at 249. L.R.-R. further noted that sometimes Appellant would visit her family's home and then sometimes, when her parents were working, she would go to Appellant's home after school. N.T. at 249-50. Along with Appellant, Appellant's wife, daughter, and her child lived at Appellant's home. N.T. at 250-51.

L.R.-R. explained that when she first met Appellant, she did not have any issues with him, but after approximately two months, when L.R.-R. was seven years old, Appellant would "sit there and touch [L.R.-R.] . . . and try to bribe [her] with things." N.T. at 252. L.R.-R. described Appellant touching her buttocks over her clothing with his hand and would give her candy or something else in exchange. N.T. at 252. L.R.-R. further testified that Appellant showed her pornography on his phone and on her iPod while they were sitting on the couch in Appellant's living room. N.T. at 254. L.R.-R. then stated that when she was at Appellant's home, Appellant "came out the bathroom with his private part out," and that Appellant said, "Look what I have for you." N.T. at 256-57. L.R.-R. stated that Appellant told her to touch his private part but that she refused. N.T. at 268.

L.R.-R. told of another incident when she was at another house with Appellant where there was a swimming pool, and while she was in the pool Appellant touched her vagina and buttocks over her clothing. N.T. at 257-59. L.R.-R. further testified of an incident when she and Appellant were in the living room of her family's home and Appellant touched her vagina over her clothing. N.T. at 260-61.

L.R.-R. continued that on another occasion, she was on the couch with Appellant in her family's home when Appellant moved her pants and touched her butt inside of her body. N.T. at 261-64. L.R.-R. recounted an incident when she was at Appellant's home and Appellant "pulled down [her] pants and just touched" her vagina, indicating that Appellant touched the inside of her vagina. N.T. at 265.

When L.R.-R. and her family were on vacation with Appellant and his family, Appellant was alone with L.R.-R. and told her that "he wanted to go to the water with [her] naked." N.T. at 267-68.

[L.R.-R. recounted asking G.R.-F. in school if Appellant had ever done anything to G.R.-F., described how her father found pornography on her iPod but proved unable to cope with allegations of inappropriate touching by Appellant and directed her to tell her mother, explained how she now feels uneasy when alone in a room with another person, even a family member. N.T. at 269-273. On cross-examination, she asserted that Appellant put the pornography on her iPod, but she admitted that classmates had been downloading pornography at the time. She

admitted that she could not specify dates when the alleged sexual abuse occurred, and that she never disclosed inappropriate touching even when her father would ask generally if anyone had ever touched her inappropriately.  N.T. at 274-283].

. . .

At the conclusion of the trial, Appellant was found guilty on all charges.  Sentencing was deferred for receipt of a report from the Pennsylvania Sexual Offender's Assessment Board ("SOAB").  On August 18, 2022, after receiving the report from the SOAB, and upon testimony of Dr. Veronique Valliere, the [trial] court found Appellant to be a sexually violent predator.  The [trial] court proceeded to sentence Appellant on both dockets to an aggregate term of twenty-two to forty-eight years of incarceration in a State Correctional Institute.

Trial counsel filed a motion to withdraw immediately following sentencing, which was granted by [the trial] court the same day.  [New counsel] filed post-sentence motions challenging both the weight and sufficiency of the evidence in all charges, alleging prejudice as to holding trial after the first mistrial was declared, and contending that the sentences imposed were excessive and an abuse of discretion.  On November 1, 2022, the [trial] court denied the post-sentence motions.

On December 1, 2022, Appellant , through Appellate Counsel, filed a Notice of Appeal to the Superior Court.  The [trial] court, by order dated December 13, 2022, directed that Appellant file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b)(1).  Appellant filed a concise statement on December 20, 2022, alleging[, *inter alia*, that the Commonwealth's witness intentionally and in bad faith caused a mistrial because he knew his testimony was failing to incriminate Appellant and the prosecution's case was falling apart, and that the trial court erred and abused its discretion in imposing sentence.]

Trial Court Opinion, 2/3/23, at 1-11.

Appellant presents two issues for this Court's consideration:

1. Whether the lower court abused its discretion by imposing an aggregate sentence of 22-48 years in state prison on a 64-year-old defendant thus making it a *de facto* life sentence.

2. Should a second trial in this matter have been precluded by the mistrial at the first which was caused by the prosecuting officer's unprovoked reference to [Appellant's] refusal to be interviewed by him?

Brief for Appellant, at 9.

Appellant first contends the trial court abused its discretion by imposing an aggregate prison sentence of 22 to 48 years, comprising mandatory minimum sentences of ten to twenty years on each of two counts of Aggravated Indecent Assault, a one-to-four-year sentence for Corruption of Minors, and a one-to-four-year sentence for Indecent Assault. The court also sentenced Appellant to a concurrent sentence of one to four years for a separate count of Corruption of Minors.

An appeal raising the discretionary aspects of sentencing is not guaranteed as of right; rather, it is considered a petition for permission to appeal. To reach the merits of a discretionary aspects claim, we must engage in a four-part analysis to determine:

> (1) whether appellant has filed a timely notice of appeal, see Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, see Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.
>
> The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent

with a specific provision of the Sentencing Code; or (2) contrary
to the fundamental norms which underlie the sentencing process.

*Commonwealth v. Mulkin*, 228 A.3d 913, 916 (Pa. Super. 2020) (citations omitted).

Appellant preserved his sentencing challenge in a post-sentence motion, filed a timely notice of appeal, and, pursuant to Pa.R.A.P. 2119(f), included in his appellate brief a concise statement of the reason relied upon for allowance of appeal in which he claims that the trial court's imposition of consecutive sentences and failure to consider mitigating circumstances resulted in a manifestly excessive sentence.

It is well established that under 42 Pa.C.S.A. § 9721, the trial court has discretion to impose its sentences consecutively or concurrently to other sentences being imposed at the same time or to sentences already imposed. *See* 42 Pa.C.S.A. § 9721(a). Although a bald claim of excessiveness due to consecutive sentences does not raise a substantial question, a claim the imposition is unreasonable, with explanation of the facts and circumstances, raises a substantial question. *Commonwealth v. Dodge*, 77 A.3d 1263, 1270-71 (Pa. Super. 2013).

Assuming *arguendo* that Appellant adequately developed his claim in this regard, we discern from the record that the trial court reasonably ran his mandatory sentences and standard range sentences consecutively. The crux of Appellant's challenge is that the imposition of consecutive sentences under the present sentencing scheme results in a manifestly excessive, *de facto* life sentence on a 64-year-old man reputed for his superior work ethic and known

in his neighborhood as "El Viejo", meaning "the old man", "for crimes which, while despicable, are not violent." Brief for Appellant at 18. We disagree.

Initially, we observe that the Berks County Public Defender's argument that Aggravated Sexual Assault and Indecent Assault are not crimes of violence is contrary to pertinent authority. For example, pursuant to section 9714 of the Judicial Code, Sentences for Second and Subsequent Offenses, "the purpose of [which] is to deter violent criminal acts by imposing harsher penalties on those who commit repeated crimes of violence," Aggravated Indecent Assault is defined as a crime of violence. *See* 42 Pa.C.S.A. 9714(a)(1)(g). Similarly, Indecent Assault is included among the offenses listed as acts of "sexual violence" under The Protection of Victims of Sexual Violence or Intimidation Act ("PVSVIA"), 42 Pa.C.S.A. §§ 62A01-62A20. Our jurisprudence, moreover, has identified sexual assault as a violent offense. *See*, *e.g.*, *Commonwealth v. Bey*, 841 A.2d 562, 566 (Pa. Super. 2004) (recognizing that "all sexual crimes are inherently violent as invasions of the victim's bodily integrity and differ only in the degree to which this is true.")

Furthermore, the court acted within its discretion to impose consecutive sentences even if they amounted to a lengthy sentence imposed on a 64-year-old defendant. *See Commonwealth v. Clary*, 226 A.3d 571, 581 (Pa. Super. 2020) ("[D]efendants convicted of multiple offenses are not entitled to a 'volume discount' on their aggregate sentence.") (citation omitted). The Commonwealth established at trial that Appellant committed multiple crimes of sexual violence against two children whose parents and guardians had

entrusted the children to Appellant's company and care in there small, shared neighborhood. The sentence imposed was not "grossly disparate" to Appellant's conduct, nor does it "viscerally appear as patently unreasonable." *Commonwealth v. Bankes*, 286 A.3d 1302, 1310 (Pa. Super. 2022)(quoting *Commonwealth v. Gonzalez-Dejusus*, 994 A.2d 595, 599 (Pa. Super. 2010). Moreover, the trial court had the benefit of the PSI and imposed standard range and mandatory sentences. Under such circumstances, this Court "will not consider the sentence excessive." *Bankes*, *supra*. For these reasons, Appellant's challenge to the discretionary aspects of his sentence fails.

In Appellant's remaining issue, he challenges the trial court's denial of his motion to bar re-prosecution on double jeopardy grounds after an experienced law enforcement officer caused a mistrial at the first trial when he referred to Appellant's exercise of pre-arrest silence. He sets forth no argument or explanation, however, as to how he is entitled to relief. "Rule 2119 of Pennsylvania Appellate Procedure requires that an appellant's brief identify the issue or issues to be reviewed by this Court, followed by citations to legal authority supporting the claim." *Commonwealth v. Midgley*, 289 A.3d 1111 (Pa. Super. 2023) (citation omitted). "Where the appellant fails to develop an issue or cite legal authority, we will find waiver of that issue." *Id*. Moreover, "[t]his Court will not act as counsel and will not develop arguments on behalf of an appellant." *Commonwealth v. Kane*, 10 A.3d 327, 331 (Pa. Super. 2010) (citation omitted). Accordingly, we find this issue waived.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/08/2023